UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Dagan Chamberlain,

Plaintiff,

v.

Bruce London, *in Individual and Official Capacities*,

Defendant.

File No. 24-cv-2184 (ECT/SGE)

**OPINION AND ORDER**

---

David Reed Lundgren and Adam T. Johnson, Lundgren & Johnson, PSC, Minneapolis, MN; and Richard E. Student and Steven J. Meshbesher, Meshbesher & Student, P.A., Minneapolis, MN, for Plaintiff Dagan Chamberlain.

Ashley Marie Ramstad and Jason M. Hiveley, Iverson Reuvers Condon, Bloomington, MN, for Defendant Bruce London.

---

Officers with the St. Louis Park Police Department suspected Plaintiff Dagan Chamberlain of shoplifting from a Kohl's store and perhaps being connected to a stolen vehicle. After the officers ordered Mr. Chamberlain to stop and put his hands up, Mr. Chamberlain ran. One of the officers, Defendant Bruce London, pursued Mr. Chamberlain and tackled him. The tackle broke Mr. Chamberlain's femur. In this § 1983 case, Mr. Chamberlain claims that Officer London's use of force violated the Fourth Amendment.

Officer London seeks summary judgment, and the motion will be granted based on qualified immunity. No reasonable jury could conclude that Officer London's use of force violated Mr. Chamberlain's Fourth Amendment right to be free from an unreasonable

seizure. If that weren't correct, Mr. Chamberlain has not shown that the specific right he claims Officer London violated was clearly established.

I[1]

On May 27, 2022, Saint Louis Park Police Officer Samuel Heffernan received a report from a loss-prevention employee with the Kohl's store in St. Louis Park, Minnesota, regarding a possible theft by three individuals. ECF No. 23-2 at 10:25–11:7; ECF No. 22-1 at 4. The three suspects had arrived at the store in a black Volvo, and after arriving on scene, Officer Heffernan suspected the vehicle may have been stolen because "the license plate which was a temporary license plate . . . did not appear authentic." ECF No. 23-2 at 12:15–24; ECF No. 22-1 at 2; ECF No. 22-1 at 4. Officer Heffernan testified that "[t]he font was off, the size of it was off, and from my training and experience, we know what the temporary plates look like" and the plate on the vehicle "did not appear to be the same." ECF No. 23-2 at 12:24–13:2. Officer Heffernan ran the plate and "it [came] back to a different make and model of vehicle." *Id.* at 13:2–4. Officer Heffernan put out a call for other officers to respond. *See* ECF No. 22-1 at 4.

Officer London responded and positioned his unmarked squad in the Volvo's vicinity. *See id.* Officer London witnessed a male—later identified as Mr. Chamberlain—exit the Kohl's store and enter the front passenger seat of the Volvo. ECF No. 23-4 at 16:7–12; ECF No. 22-1 at 2. Officer London received a message from Officer Heffernan that the Kohl's loss-prevention employee had confirmed that Mr. Chamberlain had

[1] In accordance with the standards governing a Rule 56 motion, the facts are undisputed or described in the light most favorable to Mr. Chamberlain.

shoplifted items from the store. ECF No. 23-4 at 16:7–12. After Mr. Chamberlain entered the front passenger side of the Volvo, Officer London activated the emergency lights on his vehicle and parked directly in front of the Volvo; from there, he could see into the vehicle through the front windshield. *Id.* at 17:1–6; *see* ECF No. 23-3 at 8:54:46–52. Officer London observed Mr. Chamberlain toss the backpack he was carrying toward the back seat. ECF No. 23-4 at 17:6–8.

Officer London and Mr. Chamberlain exited their respective vehicles at approximately the same time. *See* ECF No. 23-4 at 19:11–13 ("When I got out of my vehicle, I believe he was either still seated or in the process of getting out of the front passenger seat."). After Mr. Chamberlain exited his vehicle, Officer Heffernan directed Mr. Chamberlain to "freeze" and "put [his] hands up." ECF No. 23-1 at 19:4–22; *see* ECF No. 23-2 at 17:11–18 (testifying Officer Heffernan gave the command); ECF No. 23-4 at 20:23–21:1 (same). Mr. Chamberlain began to raise his hands but then ran away. ECF No. 23-3 at 8:54:57–55:01; *see* ECF No. 23-1 at 20:6–16. As Mr. Chamberlain was fleeing, both Officers Heffernan and London were yelling at him, telling him to "stop" and "freeze." ECF No. 23-1 at 20:17–23; *see* ECF No. 23-2 at 18:8–12 (Officer Heffernan testifying he gave commands); ECF No. 23-4 at 26:1–14 (Officer London testifying he "was saying something" and he heard Officer Heffernan yelling "stop" at Mr. Chamberlain). Mr. Chamberlain testified he was told to "stop" or "freeze" "a handful of times," or "maybe two, maybe three" times. ECF No. 23-1 at 20:17–23; *id.* at 21:6–7; *id.* at 25:8–14.

Officer London and Officer Heffernan ran after Mr. Chamberlain. ECF No. 23-3 at 8:55:01–55:04. After running for only a few seconds, ECF No. 23-1 at 25:15–19; ECF

No. 23-3 at 8:54:59–8:55:04, Officer London saw Mr. Chamberlain slow down and turn towards Officer Heffernan, ECF No. at 23-4 at 26:21–27:4, and that is when Officer London tackled Mr. Chamberlain, breaking his femur, *id.* at 29:3–11; ECF No. 23-3 at 8:55:02–55:06; ECF No. 23-1 at 21:22–24:11; ECF No. 27-1. The precise timing of Officer London's tackle in relation to when Mr. Chamberlain stopped running is something the parties describe somewhat differently. Officer London testified Mr. Chamberlain "was not stopped," ECF No. 23-4 at 29:16–20, but that he saw him "slow down," *id.* at 26:22–27:1. Mr. Chamberlain testified he "stopped." ECF No. 23-1 at 20:25–21:11. Regardless, video evidence answers the question. Security video of the Kohl's parking lot shows that Mr. Chamberlain came to a stop in the instant before he was tackled, and the force of Officer London's weight was already directed towards Mr. Chamberlain by the time he came to a stop. *See* ECF No. 23-3 at 8:55:04–05. In other words, Officer London initiated the tackle at the same time Mr. Chamberlain was stopping. *See id.* Mr. Chamberlain did not "threaten[]" the officers "verbally or physically." ECF No. 23-4 at 21:10–15.

Following the tackle, Mr. Chamberlain was handcuffed and an ambulance was called. ECF No. 23-3 at 8:55:08–8:57:00; ECF No. 23-1 at 26:10–20. Mr. Chamberlain was taken to the Hennepin County Medical Center where he was diagnosed with a broken femur[2] and underwent surgery. ECF No. 23-1 at 26:10–20, 28:1–16; ECF No. 27-1.

---

[2] In his deposition, Mr. Chamberlain testified he was told his "leg and . . . hip w[ere] broken." ECF No. 23-1 at 28:8–12. The medical record he submitted in opposition to Officer London's summary judgment motion reflects only a broken femur diagnosis. *See* ECF No. 27-1.

## II[3]

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

Whether Officer London has qualified immunity from Mr. Chamberlain's excessive force claim depends on the answers to two questions: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional . . . right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009); *see also Watson v. Boyd*, 2 F.4th 1106, 1109 (8th Cir. 2021). Courts may consider the questions in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). A § 1983 plaintiff can defeat a claim of qualified

[3] Officer London's body-worn camera footage from the incident has been permanently deleted. For this reason, Mr. Chamberlain argues he is entitled to an adverse inference. ECF No. 26 at 10–12. The deletion of this evidence is concerning, but it doesn't change things here. The Kohl's surveillance video shows the events that transpired with sufficient clarity. *See* ECF No. 23-3 at 8:54:00–55:08. And though Mr. Chamberlain argues the body-worn camera footage provided "the only audio evidence of the nature and timing of officer commands to Mr. Chamberlain relative to his response thereto," ECF No. 26 at 12, Mr. Chamberlain himself provided sufficient testimony regarding these facts, *see* ECF No. 23-1 at 19:4–22; *id.* at 20:17–23; *id.* at 21:6–7; *id.* at 25:9–12.

immunity only if the answer to both questions is yes. *Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009). "Qualified immunity 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Sok Kong ex rel. Map Kong v. City of Burnsville*, 960 F.3d 985, 991 (8th Cir. 2020) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)), *cert. denied sub nom. Kong v. City of Burnsville*, 141 S. Ct. 2839 (2021) (Mem.). If the material facts are not genuinely disputed, then the constitutionality of an officer's conduct is a question of law. *Thompson v. Reuting*, 968 F.2d 756, 759 (8th Cir. 1992); *see also Pollreis v. Marzolf*, 66 F.4th 726, 732 n.2 (8th Cir. 2023); *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003).

"For purposes of the second prong, [courts] look to 'the legal rules that were clearly established at the time' the action at issue was taken." *Graham v. Barnette*, 5 F.4th 872, 881 (8th Cir. 2021) (quoting *Davis v. Hall*, 375 F.3d 703, 711 (8th Cir. 2004)). "A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)). While Supreme Court "case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (citation modified). "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Rivas-Villegas*, 595 U.S. at 5–6 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)); *see also Kisela*, 584 U.S. at 104 (stating "[s]pecificity is especially important in the Fourth Amendment context" and that the "[u]se of excessive

force is an area of the law in which the result depends very much on the facts of each case" (citation modified)). As the Eighth Circuit has explained, a plaintiff can show that a right was clearly established in different ways:

> [1] [A] plaintiff may point to existing circuit precedent that involves sufficiently "similar facts" to "squarely govern[ ]" the officer's actions such that the officer had "notice that [his] specific use of force [was] unlawful," *Kisela v. Hughes*, 584 U.S. [100, 104–05] (2018) (per curiam), [2] present "a robust consensus of cases of persuasive authority" doing the same, *see De La Rosa v. White*, 852 F.3d 740, 745 (8th Cir. 2017), or [3] demonstrate that a general constitutional rule applied with "obvious clarity" to the facts at issue, *see Rokusek v. Jansen*, 899 F.3d 544, 548 (8th Cir. 2018).

*Boudoin v. Harsson*, 962 F.3d 1034, 1040 (8th Cir. 2020) (third, fourth, and fifth alterations in original).

"To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances." *Brown*, 574 F.3d at 496 (citations omitted); *accord Kohorst v. Smith*, 968 F.3d 871, 876 (8th Cir. 2020). Under that standard, the Court must evaluate all the facts and circumstances surrounding the use of force, "careful[ly] balancing . . . the nature and quality of the intrusion on [Mr. Chamberlain's] Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citation modified). "Once the predicate facts are established, the reasonableness of the [officer's] conduct under the circumstances is a question of law." *Howard v. Kansas City Police Dep't*, 570 F.3d 984, 989 (8th Cir. 2009) (citation omitted).

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. The "reasonableness of the force used" is evaluated "from the perspective of a reasonable officer on the scene, not with the benefit of hindsight." *Kohorst*, 968 F.3d at 876. "This evaluation entails careful consideration of the case's particular facts and circumstances, including: '(1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Michael v. Trevena*, 899 F.3d 528, 532 (8th Cir. 2018)). "The degree of injury suffered, to the extent 'it tends to show the amount and type of force used,' is also relevant to our excessive force inquiry." *Montoya v. City of Flandreau*, 669 F.3d 867, 871 (8th Cir. 2012) (citing *Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011)). "[F]orce is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public." *Jackson v. Stair*, 944 F.3d 704, 711 (8th Cir. 2019) (quoting *Brown*, 574 F.3d at 499). The Eighth Circuit has "held that qualified immunity protects law enforcement from liability where the suspect was non-compliant and resisted arrest, or ignored commands from law enforcement." *Id.* (citation modified).

Officer London's use of force was objectively reasonable under the circumstances. At the time of the arrest, Officer London possessed reasonable suspicion that Mr. Chamberlain was involved in stealing a vehicle, a felony-level crime. *See* Minn. Stat.

§ 609.52, subdiv. 3. Officer Heffernan testified that he suspected the temporary license plate on the black Volvo was fake based on the plate's font type and size. ECF No. 23-2 at 12:24–13:2. And when he ran the plate, it came back to a different vehicle. *Id.* at 13:2–4. These observations provided reason to suspect the Volvo had been stolen. *See United States v. Rojas-Millan*, 234 F.3d 464, 469 (9th Cir. 2000) (holding officer reasonably suspected a vehicle was stolen because the license plate was not listed as a valid license plate); *United States v. Pineda*, No. 3:22-CR-00016-MMD-CSD-1, 2023 WL 3276467, at *11 (D. Nev. May 4, 2023) (holding the fact that a "Jeep's license plates belonged to a Honda Accord . . . serve[d] as independent reasonable suspicion to prolong the stop because . . . fictitious plates may be an indicator that a vehicle is stolen"); *Augustus v. City of Los Angeles*, No. 2:22-CV-02640, 2023 WL 4291437, at *4 (C.D. Cal. May 31, 2023) (finding officers had reasonable suspicion to investigate possible stolen vehicle where license plates did not match the vehicle); *see also United States v. Cooper*, 431 F. App'x 399, 402 (6th Cir. 2011) (holding discrepancy in car's actual color and the color listed on its registration provided reasonable suspicion of a stolen vehicle where officers testified that a color discrepancy often indicated car theft and vehicle was spotted in a high-crime area); *Massengale v. Dicus*, No. 5:24-CV-02352-SSS-SSC, 2024 WL 7055216, at *4 (C.D. Cal. Dec. 5, 2024) (finding officer had reasonable suspicion that vehicle was potentially stolen where license plates and vehicle identification number were not "showing in [law enforcement's] system"); *cf. United States v. Galindo-Gonzales*, 142 F.3d 1217, 1223 (10th Cir. 1998) ("[A] defining characteristic of our traffic stop jurisprudence is [that] the defendant's lack of a valid registration, license, bill of sale, or some other indicia of proof

to lawfully operate and possess the vehicle in question . . . giv[es] rise to objectively reasonable suspicion that the vehicle may be stolen."); *United States v. Moore*, 303 F. App'x 767, 768 (11th Cir. 2008) (per curiam) (stating absence of vehicle registration and license tag in computer system may "have been an indication that the vehicle was stolen").

And Mr. Chamberlain resisted arrest and attempted to flee. Accepting Mr. Chamberlain's recollection of events, when he exited the Volvo, Officer Heffernan instructed him to "freeze" and "put [his] hands up." ECF No. 23-1 at 19:4–22. Mr. Chamberlain began to raise his hands and then took off running. ECF No. 23-3 at 8:54:57–55:01. Although his flight was short-lived, lasting only a few seconds, Mr. Chamberlain testified that he heard the officers telling him to "stop" or "freeze" two or three times as he was running. ECF No. 23-1 at 21:6–7; *id.* at 25:10–11. The record does not reveal precisely how long it took Mr. Chamberlain to begin complying with these commands. For example, it is not clear whether Mr. Chamberlain was told to "stop" or "freeze" and then he continued to run for a few seconds, or whether he stopped more immediately. But that does not affect the outcome here. Although Mr. Chamberlain stopped after running for a few seconds, Officer London's weight was directed at Mr. Chamberlain before he came to a stop. *See* ECF No. 23-3 at 8:55:04–05. And there is no dispute that Mr. Chamberlain had time to comply with the officer's commands prior to fleeing. *Jackson v. Brooklyn Ctr.*, No. 21-cv-2072 (SRN/DJF), 2023 WL 2368032, at *14 (D. Minn. Mar. 6, 2023) ("Jackson had ample time to comply with officers before he led them on a foot chase."), *aff'd sub nom. Jackson v. City of Brooklyn Ctr.*, No. 23-1678, 2023 WL 6876550 (8th Cir. Sept. 28, 2023). In such a "rapidly evolving" situation, *Graham*,

490 U.S. at 397, it is objectively reasonable that Officer London would have apprehended Mr. Chamberlain at the earliest possible opportunity.

It is true that, under the plaintiff-friendly version of the facts, Mr. Chamberlain did not pose a threat to Officer London or others, but it doesn't matter.[4] Because the first and third *Graham* factors support the reasonableness of Officer London's use of force, the fact that Mr. Chamberlain did not pose a risk to the officers does not mean the use of force was inappropriate. *See Ehlers v. City of Rapid City*, 846 F.3d 1002, 1011 (8th Cir. 2017) (stating that the defendant's "argument that no force was appropriate because he was being arrested for a nonviolent misdemeanor and was not resisting is inapplicable because he at least appeared to be resisting," and that the officer "was entitled to use the force necessary to effect the arrest."). Nor does the severity of Mr. Chamberlain's injury show that Officer London's force was excessive. "[I]t is unrealistic to expect a police officer, in the heat of the moment, to discern whether a particular . . . injury would result from a takedown or to plan a careful landing for the detainee's [leg]." *Blazek v. City of Iowa City*, 761 F.3d 920, 925 (8th Cir. 2014); *see Kelsay v. Ernst*, 933 F.3d 975, 980 (8th Cir. 2019).

The cases Mr. Chamberlain cites to support his argument that Officer London used excessive force are distinguishable. *See Brown*, 574 F.3d at 497 (holding officers used excessive force where suspect "posed at most a minimal safety threat to [the officers] and

---

[4] Officer London testified that after Mr. Chamberlain entered the Volvo, he observed Mr. Chamberlain "reaching down [with both arms] towards the center console area of the vehicle he was seated in." ECF No. 23-4 at 17:8–15. According to Officer London, these movements suggested Mr. Chamberlain may have been armed. *Id.* at 20:5–18, 25:16–25. A reasonable jury could conclude otherwise. *See* ECF No. 23-3 at 8:54:38–54:55.

was not actively resisting arrest or attempting to flee"); *McReynolds v. Schmidli*, 4 F.4th 648, 655 (8th Cir. 2021) (holding excessive force was used where suspect "was not threatening anyone, [was] not actively resisting arrest, and [was] not attempting to flee"); *Jackson*, 944 F.3d at 711–13 (holding officer used excessive force in successively tasing suspect without giving any time for suspect to respond between taser deployments); *Nieters v. Holtan*, 83 F.4th 1099, 1109 (8th Cir. 2023) (holding officer used excessive force in charging at suspect and pepper-spraying "almost simultaneously" while giving the suspect a command for the first time); *Neal v. Ficcadenti*, 895 F.3d 576, 579–82 (8th Cir. 2018) (holding officer used excessive force in using arm-bar takedown technique on man who did not match description of suspect, did not attempt to flee, and ultimately held his hands up "in complete compliance" with the officer's commands).

If there were a Fourth Amendment violation, Mr. Chamberlain has not shown that the right in question was clearly established. Mr. Chamberlain argues that it is clearly established that the use of significant force is excessive in cases "involving compliant or passively resisting suspects," and it is clearly established "that officers must allow a reasonable opportunity for a suspect to comply with commands." ECF No. 26 at 20–21. In support, Mr. Chamberlain relies on the cases distinguished in the preceding paragraph. He also cites *Shannon v. Koehler*, 616 F.3d 855 (8th Cir. 2010) for the proposition that an officer may not "use more than de minimis force against [a] suspect who was not resisting arrest and was not threatening anyone." ECF No. 26 at 21. For purposes of reviewing the summary judgment ruling in *Shannon*, however, the Eighth Circuit adopted a version of the facts in which the suspect made no attempt to flee. 616 F.3d at 863. In contrast, Mr.

Chamberlain indisputably fled. For this case's purposes, *Shannon* does not clearly establish that an officer may not use significant force in apprehending a fleeing suspect.

Mr. Chamberlain also relies on *Kelsay* for the proposition that "the Eighth Circuit has distinguished cases involving compliant or passively resisting suspects, where [the use of significant] force is unreasonable, from cases involving an actively noncompliant suspect." ECF No. 26 at 20. In *Kelsay*, the Eighth Circuit held that it was not clearly established "that a deputy was forbidden to use a takedown maneuver to arrest a suspect who ignored the deputy's instruction to 'get back here' and continued to walk away from the officer." 933 F.3d at 980. The court distinguished a situation in which a suspect "ignores a command and walks away" from situations in which force was used against "suspects who were compliant or engaged in passive resistance." *Id.* Because he fled, this distinction does not help Mr. Chamberlain.

Mr. Chamberlain argues that at the time of the incident it was clearly established that "officers must allow a reasonable opportunity for a suspect to comply with commands." ECF No. 26 at 21. But the cases he cites—*McReynolds* and *Nieters*—support the conclusion that Officer London afforded Mr. Chamberlain ample opportunity to comply. In *McReynolds*, officers were dispatched to the scene of a domestic disturbance. 4 F.4th at 651. Upon arriving, officers ordered McReynolds (who was outside) to the ground. *Id.* McReynolds stopped and turned around, though he "was slow to get to the ground." *Id.* The officers again commanded him to get on the ground, and McReynolds "dropped to his knees and put his hands in the air." *Id.* Two seconds later, the officer told McReynolds "to get 'all the way on your stomach!'" to which McReynolds immediately

responded, "On my stomach?" *Id.* It was then that the officer "tackled McReynolds from behind." *Id.* In *McReynolds*, the suspect was compliant and posed no flight risk when he was tackled. *Id.* at 653. We don't have anything like that here. *McReynolds* does not clearly establish that an officer must wait before using force on a suspect who, like Mr. Chamberlain, had opportunities to comply with the officer's commands prior to flight but chose to flee.

*Nieters* does not establish a rule applicable to this situation, either. There, officers were attempting to control protesters. *Nieters*, 83 F.4th at 1104. City officials reported that the protesters had become violent, prompting law enforcement officers to issue dispersal orders. *Id.* at 1104. After the dispersal orders were read, officers began deploying tear gas. *Id.* Nieters was a journalist, though his credentials were not visible on his person. *Id.* He followed a group of protesters away from the scene, when an officer observed Nieters and believed (mistakenly) that he was a rioter. *Id.* The officer "began running towards Nieters and told Nieters to get on the ground." *Id.* "Nieters put his hands up but, at some point, turned his body away to brace himself from the charging [officer]." *Id.* Believing Nieters intended to run, the officer "reached around Nieters, grabbed him around the chest, sprayed him with [pepper] spray, and took him to the ground." *Id.* (alteration in original). "[T]hese events happened 'almost simultaneously.'" *Id.* The Eighth Circuit noted "the problem . . . with the timing of [the officer's] actions" was that the officer "'almost simultaneously' gave Nieters the order to get on the ground, while charging and pepper-spraying him." *Id.* at 1109. The court held there were genuine issues of material fact regarding whether the officer used excessive force because:

> Nieters was a nonviolent alleged misdemeanant who was not given time to comply with the order to get on the ground prior to Officer Holtan's use of force. *See Wilson* [*v. Lamp*], 901 F.3d [981,] 989 [(8th Cir. 2018)]. When Officer Holtan began charging, Nieters had his hands in the air and stood still but, at some point, Nieters turned his body away from Officer Holtan. Taking this fact in the light most favorable to Nieters, a jury could conclude a reasonable officer would have interpreted Nieters's action in turning his body as an attempt to shield himself or the two cameras he wore from the impending impact of Officer Holtan running at him rather than an attempt to flee. *See Smith v. Kan. City, Mo. Police Dep't*, 586 F.3d 576, 581 (8th Cir. 2009).

*Id.* Unlike here, the suspect in *Nieters* did not flee, and was not given to comply with any commands.[5]

**ORDER**

Therefore, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1. Defendant's Motion for Summary Judgment [ECF No. 19] is **GRANTED**.

2. This action is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: October 5, 2026

s/ Eric C. Tostrud
Eric C. Tostrud
Chief Judge, United States District Court

---

[5] Officer London is sued in his official capacity as well, *see* Compl, and he has moved for summary judgment on the official-capacity claim, ECF No. 20 at 14–17. Mr. Chamberlain confirmed at oral argument that he is dropping this claim, and therefore, it will be dismissed.